UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


| | | |
|---|---|---|
| **CHRISTINA R. JACKSON** | * | **CIVIL ACTION** |
| **Plaintiff,** | * | **NUMBER:  19-12403 (4)** |
| **LOUIS DEJOY, UNITED STATES POSTMASTER GENERAL,** | * | **SECTION: ROBY (4)** |
| | * | |
| **Defendant.** | | |
| | *    *    * | |

## ORDER AND REASONS

**BEFORE THE COURT,** is a **Motion for Summary Judgment** filed by Louis DeJoy, the United States Postmaster General. Rec. Doc. 37.  The motion is opposed. Rec. Doc. 50.

I.    **Factual Summary**

A.  **The Original Complaint**

Plaintiff, Christina Jackson ("Jackson"), a white female letter carrier with the office for twenty (20) years filed the subject action alleging various claims of discriminatory conduct by Louis Dejoy, United States Postmaster General ("Defendant" or "USPS") stemming from her employment at the Chalmette Post Office ("CPO"). R. Doc. 11. Jackson complaint arises out of the actions of Gordon Tunnell ("Tunnell"), her immediate supervisor who is black, and Denise Trepagnier ("Trepagnier"), the Postmaster at the CPO during the time of the events, who is also black. *Id.* She alleges reverse discrimination, disparate treatment, and hostile work environment. *Id.* Tunnell supervised Jackson from August 2017-July 2018. Rec. Doc. 37-13. He began working as a supervisor for the first time at the CPO and was later detailed as Postmaster in Donaldsonville

1

in September 2018. Rec. Doc. 37-7. Trepagnier served as Postmaster at the CPO from Summer 2017-Summer 2018 and retired in December 2018. Rec. Doc. 37-8, p. 6, ln. 12-15.

According to the Original Complaint, the Plaintiff, in describing the work environment points out that the leadership and the majority of letter carries at the Chalmette Post were black, rendering her the minority. *See*, Rec. Doc. 1 ¶ 8 & 10. Jackson initially alleged seven instances of alleged reverse discrimination which seemingly occurred between September 15, 2017-November 2017, when the office was managed by Tunnell and Trepanier.

Jackson alleges that the instances of discrimination ranged from denial of leave (annual and sick), requiring her to work overtime, impeding her ability to testify in a court proceeding against a black coworker, singling her out for reprisals regarding an office-wide route inspection, and threatening her with reprisal after she had initiated a FMLA request. *Id*. at p. 2-3. Jackson contends that Tunnell denied her leave request on September 11, 2017 for September 15, 2017 to attend her sons school event. *Id*. at p. 4. She contends that while she placed the leave form on his desk and followed-up with a text to which he acknowledged; her request was denied with no explanation. *Id*. According to Jackson, black employees were not routinely denied leave and instead were being granted more extravagant leave as compared to white employees. *Id*. at p.5. Jackson therefore believes that the denial of this leave request was because she is white.

Jackson also complains about being forced to work overtime on three occasions while black employees were rarely, if ever, forced to work overtime. *Id*. at ¶ 10.  She alleges that she completed request for assistance forms but was advised that other workers were able to complete their work quickly and leave work. *Id*.

She alleges further that a few weeks later, Tunnell called a group meeting regarding upcoming route inspections. *Id*. He informed the employees that if everyone opted out of the

inspection that they would be canceled. *Id*. Jackson alleges that she was the only employee who refused to opt out of the inspection because it would result in an extension of the Arabi routes by an additional hour, one of which is her responsibility. *Id*. Jackson alleges that Tunnell singled her by asking her coworkers to talk with her about the inspection request. Jackson contends that in addition to the scornful looks she received from coworkers, the calls she received constituted harassment and violated her first amendment right to complain about workplace conditions.

In November 2017, Jackson alleges that a coworker told her that Tunnell, while on the workroom floor stated that he, "would not go down easy with this EEO." Rec. Doc. 37-4. This statement was made when Jackson was on FMLA leave. *Id*. Jackson does not allege that she was present when the statement was made, but she does allege that she viewed the statement as a threat and that she felt intimidated. Jackson further alleges that from November 20-25, 2017, Tunnell denied her leave requests after she activated the process through FMLA by Interactive Voice Recorder System after witnessing violence in the workplace by a black coworker against a white supervisor. Jackson remained on leave until February 21, 2018. *See* Rec. Doc. 37-11, Trepagnier affidavit.

She alleges that she was subpoenaed to testify at the criminal trial but Tunnell who purportedly was coordinating the timing of the employees to testify in an effort to manage the office staffing, refused to allow her to go to court. *Id*. She also alleges that the black employee who was involved in the assault had family members go to CPO and threaten to come back to "harm employee witness." *Id*.

Since Jackson was a witness, she alleges that this rendered the workplace hostile. As a result, she completed a Report of Hazard and sought assistance from the Employee Assistance Program seeking leave due to stress of participating in the case, the alleged route inspection

coercion, and daily harassment. Subsequently, the black employee was convicted of assault, however Jackson alleges that Tunnell attempted to have her reinstated to the CPO, in order to harass and intimidate Plaintiff and others.

Jackson alleges that Tunnell and Trepagnier (although there are no facts pled regarding Trepagnier) intentionally inflicted emotional distress in violation of the State Constitution and as a result she has been under the care of a doctor since November 2017. *Id*.  Jackson further alleges that she sustained loss wages, pain and suffering, mental anguish, loss of enjoyment of life, medical expenses, liquidated damages, and attorney's fees. *Id*.

### B. <u>First Amended Complaint</u>

On November 2019, Jackson filed an amended complaint and generally alleged that Trepagnier, worked with Tunnell to purposefully ensure that the white employees would work in an environment in which they were subjected to fear, harassment, threats of physical violence, and reprisals. Rec. Doc. 11, p.4. Jackson also alleged that as Tunnell's direct supervisor, Trepagnier supported and approved of Tunnell's alleged discriminatory actions. *Id*. Employees allegedly complained to Trepagnier about the discrimination they suffered at the hands of Tunnell.  *Id*.

Jackson generally alleges that Trepagnier tolerated, condoned, and encouraged mistreatment of white employees that amounted to prejudicial, disparate treatment. *Id*. Jackson complains that the Tunnell and Trepagnier hired a majority of black employees even though the district is mostly white. *Id*. Jackson also alleges that Trepagnier and Tunnell hired back candidates with criminal records and allowed them to harass and bully the white employees. *Id*. at. 5.

On April 27, 2017, Whitney Berry ("Berry"), a black employee, assaulted Kevin Thomas ("Thomas"), a white temporary supervisor in the workplace. *Id*. at p. 6. Jackson alleges that the

black supervisor "saw nothing wrong with reinstating the convicted employee to her position." Berry was returned to work on November 15, 2017. Rec. Doc. 37-7.

Jackson alleges that the white employees were thereafter forced to work in an environment of chaos, lawlessness, fear, and discrimination. Jackson alleges that the black managers permitted the black employees to engage in behavior that a white employee would be disciplined for such as: stealing mail, failing to deliver certified mail, failing to report leave time or retroactive use of such time, verbal harassment, stalking, possession of illegal drugs, lying about workplace incidents and more.

While Jackson acknowledges that Tunnell was at a seminar and not at the CPO on the date and time of the assault however, she faults him for Berry's job reinstatement. *Id*. at p. 8. Jackson further alleges that after the assault, Trepagnier brought every employee in her office except for Thomas, the white temporary supervisor, to apologize for appointing Thomas as a 204B supervisor. *Id*. at. 7.

Jackson also alleges that she became afraid and started shaking on November 15, 2017 after Tunnell announced that Berry would return to work the next day. *Id*. at p. 8. However, she alleges that all of the black employees began cheering. She complains that after this event the campaign of harassment, suppression of her rights, and reprisal began because she not only witnessed the assault but testified about what she saw.  Jackson alleged that Tunnel and Trepagnier violated the FMLA by failing to approve her leave time request with the intent to discriminate or harass as a means for reprisals for Jackson's reaction to Berry's return. *Id*.

Jackson also alleges a first amendment violation for the alleged attempt to deny her the right to testify at the trial of Berry on behalf of the prosecution. Jackson alleges that Trepagnier knew about Tunnell's actions and acquiesced in them all in violation of La. Const. AR. 1 §7.

5

Jackson also generally alleges violations of LSA-Const. Art. 1, §§3, 12, 22 and 25 by violating her due process, privacy, freedom from intrusion, pursuit of happiness, and her recognized vested property interests in her job and benefits as a USPS employee with over twenty years' experience.

Finally, Jackson alleges that Tunnell and Trepagnier, by allowing the assault incident to occur, intentionally inflected severe emotional distress. She alleges that these managers made her and her white co-employees working conditions so intolerable that a reasonable employee would feel "compelled to submit to adverse actions." Jackson also alternatively added a claim of discrimination based upon sex if the complained of actions were not based upon race. *See* Rec. Doc. 11, p. 11.  Jackson also modified her demand from $1 million to $300,00 or more plus liquidated damages.

### C. Administrative Complaint.

The EEO complaint filed by Jackson on November 19, 2018 alleges that she was discriminated against because she is a white 45-year-old female. Rec. Doc. 37-2. She alleges that she was retaliated against on October 19, 2017. *Id.* She further alleges that she was discriminated against on September 15, 2017, October 5, 2017, October 6, 2017, and November 22, 2017 when management forced her to work overtime. *Id.* Jackson alleges that she was forced to work overtime even though she was not on the Overtime Desired List ("ODL") and Tunnell allowed City Carrier Assistants ("CCA") who are assistants that help letter carriers to eliminate overtime off,  to leave early rather than assist her. *Id.* Additionally, Jackson complained that management denied her eight hours of administrative leave on September 15, 2017 while changing the schedule to let a CCA have a no-show day.

She alleged that when she was subpoenaed to testify at the trial of the CPO employee who assaulted a CPO supervisor, management interfered and attempted to stop her from testifying.

Furthermore, Jackson alleges that when management learned that she has an EEO complaint, Tunnell stated on the work room floor that he was not going down easy. She also alleged that after the statement management went in the system and removed her sick leave. Jackson also sought the removal of Gordon Tunnell from the post office and an award of $300,000.00 in this complaint.

On January 19, 2018 the Postal Service accepted five of the seven complaints raised by Jackson.  Rec. Doc. 37-3. Among the accepted complaints were the September 15, 2017 denial of annual leave, October 6, 2017 requirement to work overtime, and the October 6-7, 2017 coercion to cancel her scheduled route inspection. *Id*. The Office also accepted the complaint that on November 20-25, 2017 Jackson's sick leave request was denied and the complaint that on an unspecified date that the supervisor was not going down easy with an EEO complaint. *Id*.

Plaintiff did not amend her EEO Administrative Claim. On May 28, 2019, Administrative Judge Claudine James issued an Order and Decision in which she dismissed Plaintiff's Administrative Complaint. On May 30, 2019, the USPS issued a Notice of Final Action, which implemented the Administrative Judge's dismissal.

### D.  **The Subject Motion**

In the subject motion, the Defendant advances the dismissal of several of Jackson's claims. First, the Defendant argues that Jackson cannot establish the prima facie elements of her hostile work environment claim or her disparate treatment claim. Nor can she establish that the alleged harassment was race-based. Second, the Defendant contends that the alleged harassment was not severe or pervasive enough to create a hostile work environment.

The Defendant further contends that it believes that the thrust of Plaintiff's hostile work environment argument will be that two of her co-workers, Shantrell Berfect ("Berfect") and Eboni

Lee ("Lee"), created a hostile work environment in 2018 and 2019.[1] However, according to the Defendant the vast majority of incidents that Plaintiff now complains about did not involve her at all, and she was merely a bystander in others. Moreover, none of the incidents, individually or combined, are sufficient to create a hostile work environment; nor were included in Jackson's administrative complaint. The Defendant contends that it was not able to locate cases in which the continuing violation doctrine for allegedly hostile acts that occurred after the filing period for the administrative claim.

Alternatively, Defendant contends that even if Jackson is able to set the prima facie elements of harassment based upon race, the claim is subject to dismissal because of a combination of legitimate business decisions and inadvertent mistakes made by a supervisor who was new to the job. The Defendant therefore suggests that both of the basis would constitute legitimate, nondiscriminatory reasons that overcome any inference of race-based harassment.

Jackson however contends that while race based discrimination is difficult to prove, it may exist where race guided Tunnell and Trepganier's decisions and conduct towards Jackson. Rec. Doc. 50. Jackson further contends that she is not required to exhaust her administrative remedies for acts occurring after her administrative claim because these acts may be considered in evaluating her hostile environment claim. Jackson also contends that issues of material fact exist regarding whether Tunnell and Trepagnier were guided by race in their acts and omissions that affected Jackson and whether their proffered non-discriminatory reasons are in fact pretext.

---

[1] The government concedes that Berfect and Lee were involved in multiple loud arguments with co-workers and supervisors in 2018 and 2019 and that Plaintiff witnessed some of these and learned of others by word of mouth.

Jackson contends that her claims meet all prima facie elements of discrimination, hostile work environment.  Rec. Doc.50.  Jackson further contends that the Postmasters proffered reasons are pretext for racial-based discrimination and that the harassment she complains of affected a term, condition, or privilege of her employment. *Id*.

## II.   <u>Standard of Review</u>

Summary judgment is appropriate when the evidence before a court shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id*.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate. *Id.* "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). However, Rule 56 does not require a court to "sift through the record in search of

evidence to support a party's opposition to summary judgment." *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (quoted source omitted).

In evaluating a motion for summary judgment, courts "may not make credibility determinations or weigh the evidence" and "must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party." *Total E & P USA Inc. v. Kerr–McGee Oil and Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013) (citations omitted). While courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*). To rebut a properly supported motion for summary judgment, the opposing party must show, with "*significant* probative evidence," that a genuine issue of material fact exists. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (emphasis added). " 'If the evidence is merely colorable, or is not significantly probative,' summary judgment is appropriate." *Cutting Underwater Tech. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 517 (5th Cir. 2012) (quoting *Anderson*, 477 U.S. at 248).

Relatedly, there can be no genuine dispute as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322-23. This is true "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

When a movant bears the burden of proof on an issue, it must establish "beyond peradventure all of the essential elements of the claim ... to warrant judgment in [its] favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). In other words, the movant must

affirmatively establish its right to prevail as a matter of law. *Universal Sav. Ass'n v. McConnell*, 14 F. 3d 52 (5th Cir. Dec. 29, 1993).

III.     **Analysis**

A.     **Failure to Exhaust-Hostile Work Environment Claims**

The Defendant contends that during discovery, it became apparent that Jackson would contend that two of her black co-workers, Berfect and Lee, created a hostile work environment at the CPO. However, Plaintiff only mentioned Berfect in passing in her Amended Complaint and did not mention Lee at all. R. Doc. 11 at ¶ 13. The Defendant contends that the same is true of Plaintiff's Administrative Claim, where Plaintiff focused on Tunnell and Trepagnier, while Berfect was only mentioned as a comparator (not as someone who harassed her or created a hostile work environment).[2]  The Defendant therefore contends that because Jackson failed to raise any of the issues related to Berfect and Lee during the pendency of her Administrative Claim, she failed to exhaust her administrative remedies with regard to these events and the hostile environment claim allegedly caused by Berfect and Lee should be dismissed.

Jackson contends that she was not required to exhaust her administrative remedies for subsequent incidents. According to Jackson while the thrust of her allegations are against Tunnell, she alleged "some" liability against Trepagnier because she should have stopped Tunnell's discriminatory and retaliatory actions and her failure to do so renders her complicit. Moreover, according to Jackson, her claims against Trepagnier could reasonably be expected to grow out of her EEO complaint because the Trepagnier was present during some of the incidents and had

---

[2] *See* Exhibit 3 at pp. 17-18.

supervisory authority over Tunnell. Jackson further contends that her hostile environment claim could be reasonably expected to grow from the allegations in her EEO complaint because Jackson alleged numerous incidents of race-based discrimination, harassment, and reprisal by CPO management occurring over more than a year.

To exhaust, a plaintiff must file a timely charge with the EEOC and then receive a notice of the right to sue. *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 379 (5th Cir. 2002). Administrative exhaustion "is not a jurisdictional requirement," *Stroy v. Gibson ex rel. Dep't of Veteran Affs.*, 896 F.3d 693, 698 (5th Cir. 2018), but neither is it merely "a procedural 'gotcha' issue," *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 272 (5th Cir. 2008). Instead, administrative exhaustion "is a mainstay of proper enforcement of Title VII remedies," and exists "to facilitate the [EEOC's] investigation and conciliatory functions and to recognize its role as primary enforcer of anti-discrimination laws." *See Id.; Filer v. Donley*, 690 F.3d at 647 (5th Cir. 2012).

To satisfy exhaustion, a claim generally must <u>arise</u> out of the plaintiff's EEOC charge. *See Id*. That requirement relates to a key purpose of an employment-discrimination charge, which is to give the employer notice of the existence and general substance of the discrimination allegations. *See Manning v. Chevron Chem. Co*., 332 F.3d 874, 878 (5th Cir. 2003). However, a claim need not always arise from the EEOC charge form for exhaustion to occur, in some circumstances, other documents can serve as a charge. *See Id.* at 879. In assessing whether a filing is a charge, the key question is whether "the filing, taken as a whole, should be construed as a request by the employee for the agency to take whatever action is necessary to vindicate her rights." *Federal Express v. Paul Holowecki*, 552 U.S. 389, 398 (2008).

Ordinarily, an employee may not base a Title VII claim on an action that was not previously asserted in a formal charge of discrimination to the EEOC, or that could not "reasonably be

expected to grow out of the charge of discrimination." *Pacheco v. Mineta*, 448 F.3d 783, 789 (5th Cir.2006) (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir.1970)). The purpose of this exhaustion doctrine is to facilitate the administrative agency's investigation and conciliatory functions and to recognize its role as primary enforcer of anti-discrimination laws.  In hostile work environment claims, however, if one act alleged to have created the hostile environment is timely exhausted, "a court may consider 'the entire scope of the hostile work environment claim.' " *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir.2009) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002)).

The continuing-violation doctrine relieves a plaintiff of establishing that all the complained-of conduct occurred within the actionable period if the plaintiff can show a series of related acts, one or more of which falls within the limitations period. *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 351 (5th Cir. 2001) (citing Messer v. Meno, 130 F.3d 130, 135 (5th Cir. 1997)). To apply this "continuing violation doctrine ... the plaintiff must demonstrate that the separate acts are related." *Id*; *Donley*, 690 F.3d 647. Nevertheless, "[t]he United States Supreme Court has made clear that the continuing[-]violation doctrine does not apply to discrimination and/or retaliation claims." *Skaggs v. Van Alstyne Indep. Sch. Dist.,* No. 4:16-CV-00227-CAN, 2017 WL 77825, at *6 (E.D. Tex. Jan. 9, 2017) (citing *Morgan,* 536 U.S. 110-21); see *Heath v. Bd. of Sup'rs for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 737 (5th Cir. 2017), as revised (Mar. 13, 2017) ("Claims alleging discrete acts are not subject to the continuing violation doctrine; hostile workplace claims are."); *See also Cicalese v. Univ. of Texas Medical Branch*, 456 F. Supp. 3d 859 (S.D. Tx., Galveston Division, Feb. 5, 2020)(to the extent that the plaintiffs' hostile-work-environment claims rely upon acts preceding the cutoff date support their discrimination claims, the continuing-violation doctrine does not apply.)

"A hostile work environment exists 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Stewart*, 586 F.3d at 328 (quoting *Morgan*, 536 U.S. at 116). To determine whether a work environment is "hostile," a court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir.2002) (quoting *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir.2000)).

A hostile work environment claim involves repeated conduct. Thus, the "unlawful employment practice" does not occur on any particular day, but rather occurs over a series of days, months, or even years. Moreover, a single act of harassment, unlike discrete acts of discrimination, may not be actionable standing alone as hostile environment claims are usually based on the cumulative effect of individual acts. The Court has decided that, provided that an act contributing to the claim occurs within the filing period, the conduct during the entire time period involved in the creation of the hostile environment may be considered in determining liability. Therefore, as long as one of a series of acts that are part of the same unlawful employment practice falls within the statutory time period for filing a charge, the charge will not be time-barred.

The Fifth Circuit, in *Stewart v. Miss. Transp. Comm'n*, held that a male supervisor's actions toward the plaintiff female employee during the two periods she was assigned to work for him did not constitute a continuing violation for purposes of the plaintiff's hostile work environment claim under Title VII. *Stewart*, 586 F.3d 321. The Court held that even though the later acts were sufficiently related to the earlier ones to constitute a single "practice" for limitations purposes, the two periods of alleged harassment were severed by the employer's intervening act of reassigning

14

the plaintiff to different supervisor. *Id.* The Fifth Circuit noted that the proper focus of the "continuing violation" inquiry under Title VII is the employer's remedial action in addressing the employee's complaints in the first instance. *Id.* Therefore, a subsequent act can be relevant to this inquiry only when it casts doubt on the reasonableness of the remedial action in the context of the employer's policies and practices.

Additionally, in *National R.R. Passenger Corp. v. Morgan*, the Supreme Court considered a Title VII claim for workplace harassment. 536 U.S. at 106. The plaintiff in that case alleged a host of discriminatory and retaliatory acts were committed against him, some occurring within the limitations period and some outside it. *Id*. The Court found that for discrete and easy to identify acts (such as a termination) the time bar applied if the acts were committed outside the limitations period. Hostile work environment claims on the other hand are based on the "cumulative effect of individual acts." *Id*. at 115. Therefore, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id*. at 117; *Heath* 850 F.3d at 740.

In this case, the gist of Jackson's claim as asserted in her EEO Complaint is that her supervisors, both of whom were black, denied her leave request on two (2) occasions, forced her to work overtime, and coerced her to cancel her scheduled route inspection. In the Amended Complaint, Jackson complains that her supervisors allowed her coworkers to create a hostile environment by permitting them to loudly argue with coworkers and supervisors and by being passive managers. Jackson alleges that she was present for some of the arguments but heard about others. These latter complaints of Jackson did not result in an amendment to her EEO complaint.

Not included the EEO complaint, but addressed in the Amended Complaint, are Jackson allegations that Tunnell in addition to the actions described above: (1) sought to interfere with

"white employees" testifying at Berry's criminal trial, (2) did not notify her when it was her time to testify, (3) mentioned her name while discussing the route inspection, and (4) made threatening statements about her but not to her regarding her EEO claim.  In a further attempt to expand the allegation, Jackson advances in the opposition to the subject motion that, in March 2018, Trepagnier was present when Berfect, a black coworker, assaulted a white coworker Sandy Keller. She also alleges that Trepagnier failed to stop Berfect showing a "favoritism towards blacks." Jackson also contends that Berfect and Lee generally verbally harassed, intimidated, and assaulted Jackson and other white employees without consequence. From Jackson's perspective each of these acts are examples of an environment that was hostile to her because she is white.

In evaluating the evidence, the alleged hostile acts committed by Tunnell and Trepagnier involved their job duties as supervisors such as leave decisions and managing employee disputes. According to the charge, the dates on which Jackson's alleged discrimination based on race, color, sex, age, and retaliation were September 15, 2017, October 5, 2017, October 6, 2017, and November 22, 2017. *See* Rec. Doc. 37-2, p. 1. Notably the reason for Jackson's requested leave in November 2017 was because she witnessed a black co-worker attack a white supervisor and heard threats from the coworkers' boyfriend regarding "f**king up witnesses." These events were classified by Jackson as creating a hostile work environment.  She also alleged in her complaint that she was denied sick leave because of her race and that Tunnell harassed "older white American females." *See* Rec. Doc. 37-4, p. 13. In the EEO complaint Jackson testified that she reported harassment and hostile work environment through to the Office of Inspector General on September 28, 2017 but received no response. *Id.* at p. 15. It is unclear which if any event sparked Jackson's September complaint.

As part of Jackson's hostile environment claim, she contends that after the Berry-Thomas fight, Berry was allowed to return to the workplace. *See* Rec. Doc. 37-7. This incident occurred on April 27, 2017 and served as the basis for Jackson's leave request of November 15, 2017, which is also the date it was announced that Berry would return to the office. *See* Rec. Doc. 50-6, Thomas Affidavit; *See also* Rec. Doc. 50-4 at ¶7, Jackson Affidavit. Jackson believed that Berry's return was because Tunnell or Trepagnier allowed it. *Id*. This portion of the hostile claim relates back to the originally filed charge as such, the continuing-violation doctor applies. Therefore, the claim arising from Berry-Thomas incident is exhausted and the summary judgment as to this portion of the claim is Denied.

Jackson also seeks to include other instances of coworker disputes as proof of a hostile environment claim. On incident which occurred in March 2018, involved Berfect and Keller, again a black and white employee, but not Jackson. See Rec. Doc. 1 at ¶13.  According to Keller, Berfect yelled at her, lunged toward her in front of management, and threatened her.  See Rec. Doc. 50-3 at ¶29, Keller Affidavit. According to Keller, Berfect threatened her by saying "I'll whip your a** before Denise [Trepagnier] can stop me." *Id*. Jackson seemingly wants to use the Keller-Berfect threat as evidence that there was a hostile environment towards Jackson.

 In considering this incident, the only related fact is that the incident was between a black employee and a white employee and Jackson's perception that the black employee was treated more favorably. It did not involve her or Tunnell with whom she had filed the EEO complaint against for denial of her leave requests. Moreover, even if Trepagnier was somehow present or involved, the incident did not have any relation to employee leave time. The Berfect-Keller incident of March 2018 is not a continuing violation because it is not related to Jacksons EEOC

charge, nor does it arise out of the charge. This incident of alleged hostile environment is not exhausted and dismissed.

Additionally, Jackson seeks to complain generally about Berfect and Lee's conduct in the workplace. However, her affidavit is devoid of any clarity as to time, place, event, or even which if any instances involved her. The affidavit also does not indicate whether Tunnell, Trepagnier, or both were present and failed to discipline these or other employees involved in any incident. Rec. Doc. 50-2. Again, neither Berfect nor Lee's conduct claims are related to Jacksons charge of race, color, sex, age, retaliation, or the only lodged hostile environment referenced in the EEO charge.

Additionally, Jackson's affidavit does not state or describe any specific instances that she was verbally assaulted by Berfect or Lee. The USPS however acknowledges that Berfect and Lee were involved in multiple loud arguments with co-workers and supervisors in 2018 and 2019. *See* Rec. Doc. 50-2. It is further undisputed that Jackson sought FMLA leave due to the stress of witnessing an attack by a black co-worker on a white supervisor and testifying in the criminal proceeding, which was a part of her EEOC charge in November 2017. See Rec. Doc. 37-4.

The Court finds that the continuing violation doctrine does not apply to the March 2018 Keller-Berfect encounter or the nondescript incidents involving Berfect and Lee because there is no evidence that these incidents were directed at or involved Jackson. For these reasons, Plaintiff failed to exhaust her administrative remedies regarding these incidents and her hostile work environment claim is not exhausted.

### B. Title VII Claims

The USPS contends that, as a white employee, Jackson is in a protected class, but she cannot establish the prima facie elements of her disparate treatment claim; namely that she suffered an adverse employment action and racially motivated intent. The USPS further contends

that it had a legitimate, non-discriminatory reason for the employment decisions. Further the Defendant contends that Jackson's disparate treatment complaints are leave related; requiring her to work overtime a few days and having her name discussed prior to a route inspection are not adverse employment actions. Additionally, there is no evidence that her supervisor's decisions were racially based. Therefore, the Defendant contends that Jackson cannot establish the third element of her disparate treatment claim.

Jackson contends that she meets the first two elements of disparate impact discrimination because she is a white female and she was qualified for the position both of which are undisputed by the Defendant. Jackson further contends that she was subjected to adverse employment actions when Tunnell interfered with her FMLA leave by contacting her while on leave to return to work and reclassifying her as Absent Without Leave ("AWOL") on November 22-25, 2017. She additionally contends that Tunnell purposefully failed to act on her PS form 3996 in which she requested CCA assistance which resulted in her working long hours to complete her route.

Title VII creates a federal cause of action for two largely separate theories of discrimination, disparate treatment and disparate impact. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977). Disparate-treatment discrimination addresses employment actions that treat an employee worse than others based on the employee's race, color, religion, sex, or national origin. In such disparate-treatment cases, proof and finding of discriminatory motive is required. *Id*. Disparate-impact discrimination, on the other hand, addresses employment practices or policies that are facially neutral in their treatment of these protected groups, but, in fact, have a disproportionately adverse effect on such a protected group. *Hebert v. Monsanto*, 682 F.2d 1111, 1116 (5th Cir.1982).

To establish a prima facie disparate treatment claim a plaintiff must establish:

> (1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he was the subject of an **adverse employment action**, and (4) he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances. *Lee v. Kansas City So. Ry. Co*., 574 F.3d 253, 259 (5th Cir. 2009).

"Adverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensation. An employment action that does not **affect job duties,** compensation, or benefits is not an adverse employment action." *Welsh v. Fort Bend Independent School Dist*., 941 F.3d 818, 824 (5th Cir. 2019) (emphasis added).

### C.   <u>Disparate Treatment Allegations</u>

#### a.   <u>Jacksons Trial Testimony and Berry's Office Return</u>

The USPS contends that Jackson's disparate treatment complaint about Berry's return to work at the CPO, as well as, her complaints regarding testifying at Berry's trial should not be considered because they are not adverse employment actions. Additionally, USPS contends that the legitimate business reasons supported Berry's return to the workplace.

Jackson contends that the supervisors at CPO failed to do anything regarding Berry's return to work showing a pattern of discriminatory acts by Tunnell and Trepagnier. She further contends that Tunnell intentionally interfered with her trial testimony. She contends that their action in both respects were directed at her and other white employees and that these acts are only being offered to present a pattern of raced-based discrimination by her supervisors.

The Fifth Circuit has noted that the pattern and practice method of proof is almost exclusively used in class actions. *Celestine*, 266 F.3d at 355-56. *Celestine* involved a series of individual claims by African American employees after the court denied class certification. *Id.* The

court in *Celestine* noted that the Supreme Court has not applied the *Teamsters* method of proof in a private, non-class suit and described the distinction between individual discrimination claims and class actions, as follows:

> The crucial difference between an individual's claim of discrimination and a class action alleging a general pattern or practice of discrimination is manifest. The inquiry regarding an individual's claim is the reason for a particular employment decision, while at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decision making.

The *Celestine* court noted that other courts had reached the conclusion that the disparate impact or the pattern and practice method of proof may not be used in private non-class suits.

*Id*. at 355-56 (citations omitted). The court concluded:

> Given the nature and purpose of the pattern and practice method of proof, this Court's precedents, and the precedents of other circuits, the district court did not err in refusing to apply the *Teamsters* method of proof as an independent method of proof to the appellants' individual claims in lieu of the *McDonnell Douglas* method at the summary judgment stage. *Id*. at 356.

This is not a 'pattern and practice suit' by Jackson, nor is this a private class action. In the case at bar, Plaintiff is proceeding as an individual under Title VII and must prove the elements of a discriminatory discharge/disparate treatment claim as set forth in *McDonnell Douglas*. *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). Therefore, to the extent that Jackson seeks to use these allegations as proof of pattern or practice claim, such a claim is not available to her and her attempted to use of these allegations for this purpose is impermissible. Therefore, to the degree Jackson offers these facts to support her individual claim, they do not constitute an adverse action.

### b.  Route Requiring Overtime

Jackson contends that Tunnell and Trepanier discriminated on the basis of race by giving her a heavier workload than other employees and by refusing to provide CCAs to help with her

21

workload. She further alleges that she was required to work overtime due to longer route. Additionally, when it was time for a review of the routes Tunnell encouraged her coworkers to contact her to "harass" her into not requesting the review. Consequently, she was forced to acquiesce in the group decision to not requesting a route evaluation which meant that she would be forced to work longer than 8 eight hours a day.

Jackson, however, cannot prove a prima facie case of discrimination, because she cannot satisfy the last two requirements of *McDonnell-Douglas*. *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). Specifically, she has not established that she suffered an adverse employment action and that others similarly situated were treated more favorably.

First, Jackson's belief that she was routinely required to work longer hours than other employees does not qualify as an adverse employment action. Adverse employment actions include only ultimate employment actions, such as hiring, firing, promoting, compensating, or granting leave. *See McCoy v. City of Shreveport,* 492 F.3d 551, 559 (5th Cir. 2007). Imposing a higher workload than that given to other employees is not an adverse employment action. *See Ellis v. Compass Group USA. Inc.* 426 Fed. Appx. 292 (5th Cir. 2011).

According to Jackson, she was treated differently from Reynell Haggins ("Haggins") presumably a black employee and comparator who also had a longer route. Haggins testified that she verbally complained about the route and it was after the route was evaluated pursuant to an annual route inspection that her route was changed. Rec. Doc. 50-4, Haggins Deposition, p. 32, ln. 14-17. Haggins also testified that both she and Jackson had requested a special route inspection before the annual route inspection in October 2017. *Id*. Haggins also testified that Tunnel asked her to ask Jackson not to have the route inspection. *Id*. at p. 35, ln. 2-4.

Jackson on the other hand contends that she submitted a PS 3996 form, which permits a mail carrier to request overtime or auxiliary assistance, but Tunnell did not respond to her requests. She further claims in her memorandum, that she had to routinely work overtime to finish her route even though she was not on the CPO overtime desired list.[3] Rec. Doc. 50.  She also seemingly did not receive CCA help.

There is no evidence confirming the submission of a PS 3996 forms although Tunnell confirmed that it is a pretty routine submission. Rec. Doc 50-5, Tunnell deposition, p. 125. Nor does the evidence confirm that Jackson verbally complained to her supervisor like Haggins for a route adjustment. See Rec. doc. 50-4, Haggins Deposition, p. 32. ln 7-11;17.

Assuming that Jackson continuously filed a PS form 3996, her requests for auxiliary assistance and the excess hours she was working would have resulted in a route inspection. See Rec. Doc. 50-5, Tunnell deposition, p. 131, 9-13. Tunnell confirmed in his deposition that he would routinely challenge the request for assistance by curtailing mail or telling mail carriers to start their delivery earlier. However, he had no independent recollection regarding Jackson's October 2017 request for help. *Id*. at 126. Even accepting her representation as true, if Jackson was required to work a longer route being overworked is not an adverse employment action. This claim fails and summary judgment is **GRANTED** as to this claim.

### c.   Denial of Leave Requests.

USPS contends that Tunnell's denial of a single annual leave request on September 15, 2017 is a legitimate non-discretionary business decision, not discrimination. Rec.Doc. 37-1. The USPS contends that Tunnell denied Jackson's leave request because the CPO could not grant leave

---

[3] Note, Jackson cites to her affidavit and the Affidavit of Sandy Keller in support of this statement, however neither affidavit speaks to this issue.

to more than 14% of employees on any single day and granting Jackson's leave request would have pushed the CPO over that number. USPS points out that Tunnell worked with Plaintiff to make sure she was still able to attend the event at her child's school and did not make this decision on account of Jackson's race.

USPS further contends that Jackson's claims that Tunnell mishandled her sick and FMLA leave requests in November 2017 and harassed her while she was on FMLA leave by sending her a threatening letter and calling her should be dismissed. Rec. Doc. 37-1. USPS offers that Tunnell handled her leave due to error and inexperience in the position but denies that race was a reason.

Jackson contends that Tunnell's explanation is pretext for racial discrimination. She points to the explanation Tunnell gave for denying her request which was that she placed the request the day before the event. Rec. doc. 50.  Jackson also contends that he told her that he had already given the day off to Roosevelt Thomas, a black letter carrier, as a reason why he could not grant her leave. *Id*.

To satisfy her burden of proof and to defeat USPS' motion for summary judgment, Jackson must offer sufficient evidence that either: (1) Jackson's articulated reasons are a pretext for discrimination, or (2) Jackson 's stated reasons, while true, are only some reasons for its conduct, and discrimination is another motivating factor. *See Autry v. Fort Bend Ind. Sch. Dist.,* 704 F.3d 344, 347 (5th Cir. 2013).

To establish pretext, "[Jackson] must substantiate h[er] claim through evidence demonstrating that discrimination lay at the heart of [Tunnell's] decision." *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002). Jackson "must rebut each non[-]discriminatory reason articulated by [Tunnell]." *Laxton v. Gap, Inc*., 333 F.3d 572, 578 (5th Cir. 2003). Jackson must rebut each reason by "produc[ing] substantial evidence of pretext." *Wallace v. Seton Family of*

*Hospitals,* 777 Fed. Appx. 83, 89 (5th Cir. 2019). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men [or women] in the exercise of impartial judgment might reach different conclusions." *Id*. Jackson can establish pretext by: (1) showing disparate treatment or (2) showing that Tunnell's proffered explanation is false or unworthy of credence. *See Id*.; *See also Vaughn v. Woodforest Bank*, 665 F.3d 632, 637-40 (5th Cir. 2011).

Tunnell suggests that Jackson was denied leave because he could not grant leave to more than 14% of employees in a single day and that allowing her off would have exceed this number. *See* Rec. Doc. 37-7 and Rec. Doc. 50-5, Tunnell deposition, p. 122.  Jackson also attested that Roosevelt Thomas, a black letter carrier had already been given September 15, 2021 off. Rec. Doc. 50-5, p. 107 and 116.  However, the evidence shows that Jackson submitted her leave request four days prior to her son's school event contrary to Tunnell's testimony. *Id*.  Rec. Doc. 50-5, p.110.

It is unclear though when Thomas submitted his request, or when Tunnell hit the 14% mark that resulted in his denial of Jackson's request. As for the November 2017 denial, Tunnell cites his inexperience and error as reasoning for his decision, but the issue of whether race was a factor remains a question of material fact.

Regarding the alleged harassment during her FMLA leave, the evidence indicates that Haggins requested and received FMLA leave but did not receive a letter inquiry from her supervisor. Haggins confirmed also that she did not call the 1-800 number. Rec. Doc. 50-4, p. 26. Tunnell's explanation for sending the absence inquiry letter to Jackson was purportedly to advise her that Berry had been transferred so that she and other coworkers would return to work. See Rec. Doc. 50-5, Tunnell deposition, p. 172-173.  However, Haggins stated in her affidavit that while she was on FMLA leave Tunnell did not call her nor send her a letter requesting her return to work. Rec. Doc. 56-4, ¶ 11.

To request leave, Haggins contacted her supervisor, Tunnell, filled out the paperwork and received her FMLA case number which notified Tunnel of her surgery. Rec. Doc. 50-4, Haggins deposition, p. 25-26. In contrast, Jackson called the Interactive Voice Recorder System to request 40 hours of FMLA sick leave because of stress and anxiety on the job. She received a FMLA confirmation number and later submitted supporting documentation for her leave requests. However, Tunnell went into the time keeping system and changed her FMLA sick leave to AWOL. Doc. 50-5, Tunnell deposition, p. 176, ln 16 and p.177, ln.5. Tunnell now advances several reasons from mistake, to lack of experience, to correcting the error at some point.

Trepagnier, the Postmaster, testified that sending an absence inquiry letter three days after the absence was unusual. She additional testified that reclassifying time from FMLA to AWOL was not the product of inadvertence. However, whether his decision was based on race is a material question of fact.

In evaluating the evidence, the Court finds that Jackson has presented evidence of disparate treatment and there is a material question of fact regarding whether Tunnell's proffered justification is pretextual. Therefore, the request to dismiss Jacksons claims arising from the September 2017, November 2017 and FMLA leave requests is **DENIED**.

**D.** **Jackson's Hostile Work Environment Claims**

USPS concedes that it is not contesting that Jackson has sufficient facts to establish that she belonged to a protected group and was subjected to unwelcome harassment. However, the USPS contends that Jackson cannot show that the harassment affected a term, condition, or privilege of employment under the fourth element of the prima facie case.

The USPS contends that none of the conduct that Jackson complained of in the Original Complaint, Amended Complaint, or EEO charge, even if taken together, is "severe or pervasive

26

enough to satisfy the object reasonable person standard. Rec. Doc. 37-1.  USPS contends that none of the conduct was physically threatening or humiliating, nor did the managers use offensive language or engage in race-based name calling. *Id*. at p.18. Finally, USPS contends that Jackson cannot establish that the alleged harassment was because of race.

In contrast, Jackson contends that the harassment by the CPO management was sufficiently severe and pervasive as to affect a term, condition or privilege of Jackson's employment and created a hostile work environment. Rec. Doc. 50, p. 23. Jackson contends that Tunnell and Trepagnier fostered a hostile work environment by allowing three black employees to verbally abuse and in one instance attack a white supervisor. *Id*.

Jackson contends that evidence of the hostile nature of the environment is the fact that three different white employees took leave to obtain medical treatment for stress, anxiety, and depression. *Id*. Jackson further contends that there were a constellation of racially motivated acts and inactions that in their totality altered terms and conditions of Jackson's employment. *Id*. Jackson further contends that Tunnel and Trepagnier, primarily by omission, but in some cases with deliberate indifference, made decisions that were uniformly violative of the interests of the Plaintiff. Rec. Doc. 60, p. 3.

Title VII also makes it unlawful for employers to require "people to work in a discriminatorily hostile or abusive environment." *Gardner v. CLC of Pascagoula*, L.L.C., 915 F.3d 320, 325 (5th Cir. 2019) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). A hostile work environment claim "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice,'" *Morgan*, 536 U.S. at 117 .

To survive summary judgment on a hostile work environment claim based on race or sex discrimination, a plaintiff must show that: (1) she is a member of a protected class; (2) she suffered

unwelcomed harassment; (3) the harassment was based on her membership in a protected class; (4) the harassment "affected a term, condition, or privilege of employment"; and (5) "the employer knew or should have known" about the harassment and "failed to take prompt remedial action." *Ramsey*, 286 F.3d at 268. "Where the alleged harasser is a supervisor, the employee need only satisfy the first four elements discussed above in making her prima facie case of hostile work environment." *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 453.

"To affect a term, condition, or privilege of employment, the harassment must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 479 (5th Cir. 2008). The alleged conduct must be objectively and subjectively hostile or abusive. *Harris*, 510 U.S. at 21–22, 114 S. Ct. 367. "The critical issue in determining whether workplace activities constitute harassment based on [race] is whether members of one [race] are exposed to disadvantageous terms or conditions of employment to which members of the other [race] are not exposed." *Reine v. Honeywell Intern. Inc*., 362 F. Appx 395, 397 (5th Cir. 2010). If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions.

The totality of the employment circumstances determines whether an environment is objectively hostile. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22 (Nov. 1993). Although no single factor is determinative, pertinent considerations are: (1) "the frequency of the discriminatory conduct"; (2) "its severity"; (3) "whether it is physically threatening or humiliating, or a mere offensive utterance"; and (4) "whether it unreasonably interferes with an employee's work performance." *Id*. at 23

One of the complained of acts that Plaintiff alleges contributed to the hostile work environment was an altercation between Berry and Thomas on April 27, 2017.[4] *See* Rec. Doc. 11. Thomas was the temporary supervisors as Tunnell nor Trepagnier were not present at the office on the day of the Berry-Thomas altercation. *See* Rec. Doc. 37-7, Declaration Tunnell. Berry's boyfriend came to the workplace and threatened coworkers who would testify about what they saw. Rec. Doc. 50-3, Keller Affidavit; Rec. Doc. 50-7, Philpott Affidavit. Jackson, was one of those employees who ultimately testified that resulted in Berry's conviction.

On November 15, 2017, Berry was allowed to return to the workplace. In light of her return, Jackson states she initiated FMLA leave due to fear and anxiety. Rec. Doc. 50-5, Tunnell Deposition, p. 67, ln. 5-10. Jackson thereafter was on leave from November 22, 2017-February 22, 2018. Rec. Doc. 50-2, ¶ 7.

There is no evidence that Jackson suffered harassment that affected a term or condition or privilege of employment because on February 22, 2018 Jackson returned to work. *See Ramsey,* 286 F.3d at 264. The evidence also shows that Berry was transferred to another location and no longer worked at the CPO when Jackson returned to work. Rec. 37-7. The summary judgment on Jackson's hostile work environment claim is **GRANTED**.

Accordingly,

## IV.  CONCLUSION

**IT IS ORDERED ADJUDGED AND DECREED** that **Motion for Summary Judgment** filed by Louis DeJoy (Rec. Doc. 37) is **GRANTED IN PART AND DENIED IN PART**.

---

[4] Berry is black and Thomas is white but there is no evidence presented that the altercation was due to race.

**IT IS FURTHERED ORDERED** that Defendants motion regarding Plaintiff's disparate treatment claim for being required to work overtime is **GRANTED.**

**IT IS FURTHERED ORDERED** that Defendants motion regarding Plaintiff's disparate treatment claim for being denied leave time is **DENIED.**

**IT IS FURTHERED ORDERED** that Defendants motion regarding Plaintiff's hostile work environment claim is **GRANTED**.

New Orleans, Louisiana, this 17th day of November 2021.


**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**